IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL CASE NO. |
| v. | 1:14-CR-0312-WSD-GGB |
| NIGEL MARC GORDON | |

## REPORT AND RECOMMENDATION

Defendant Nigel Gordon ("Defendant") is charged with firearms and cocaine trafficking offenses. He moves to suppress statements he made to law enforcement officers. (Doc. 14). Evidentiary hearings on Defendant's motion were held before the undersigned magistrate judge on December 8, 2014 (Doc. 38, Vol. 1, pages 1-101) and February 5, 2015 (Doc. 40, Vol. 2, pages 101-127) (referenced hereinafter collectively as "Tr. ___"). For the reasons discussed below, I **RECOMMEND** that Defendant's Motion to Suppress Statements (Doc. 14) be **DENIED**.

I.   **FACTS**

In May 2014, managers at the Mosaic Apartments at 5675 Roswell Road, Sandy Springs, Georgia informed the Sandy Springs Police about suspected drug trafficking in Apartment 10A in their complex. (Tr. 4-5). The managers told the police that

AO 72A
(Rev.8/82)

numerous residents had reported seeing individuals pull into the parking lot of Building 10, walk to the back door of Apartment 10A, go inside briefly, return to their vehicles, and use drugs while still in the parking lot. (Tr. 5, 20, 22-24). The managers said that they believed that a black male who drove a silver Chevrolet HHR lived in that apartment. (Tr. 5).

Sandy Springs police officers began watching Apartment 10A at about 2:30 p.m. on May 7, 2014. (Tr. 4, 6). They saw that a man parked near Building 10, walked to the back door of Apartment 10A, made a call on his cell phone, and was admitted into that apartment. (Tr. 7, 25). A short time later, the man returned to his car and sat in the driver's seat. (Tr. 7). Detective Derek Williams approached the car and recognized the man, Bobby Boonyapat, from a previous arrest. (Tr. 7-8). Boonyapat told the detective that he had just purchased cocaine in Apartment 10A. (Tr. 8-9). Detective Keith Smith entered Boonyapat's car and found rocks of crack cocaine on the floor and in a cup holder. (Tr. 9). Det. Williams then arrested Boonyapat. (Tr. 9).

As Boonyapat was being arrested, police saw a black man walking from Building 10 toward a silver Chevrolet HHR in the parking lot. (Tr. 9, 27-28). Boonyapat told Det. Williams that he had just purchased his cocaine from that man. (Tr. 9, 27-28). Det. Williams gave this information to Sergeant Scott Laughman who

2

then drove his unmarked police car toward the man (later identified as Defendant Nigel Gordon) with his blue lights flashing. (Tr. 9-10, 66-67, 75). Defendant was entering his car as Sgt. Laughman arrived and introduced himself. (Tr. 66-67). Sgt. Laughman had a badge hanging from his neck, and his firearm was not displayed. (Tr. 67-68). He told Gordon that he was investigating drug trafficking in the apartment complex. (Tr. 67, 75-76). He asked Gordon to identify himself and where he had been. (Tr. 67-68, 76). Gordon first said he had just visited his girlfriend in Apartment 10E. Upon further questioning, he said that he had come from Apartment 10A. (Tr. 68).

Sgt. Laughman asked Gordon for consent to search his vehicle, and Gordon gave consent. Officers conducted a search of the vehicle, but found nothing. (Tr. 68-69).

Sgt. Laughman then requested that canine ("K-9") officer Michael DeWald come to the apartment complex. (Tr. 69). Officer DeWald arrived soon thereafter with his dog "Rock," who is certified in drug detection. (Tr. 69, 50-51). Sgt. Laughman provided some details of the investigation to Officer DeWald and explained what he wanted DeWald to do. They talked about deploying the dog to conduct a sniff outside the apartment. Gordon was close enough to hear their conversation. (Tr. 62-63). As Officer DeWald was preparing to release Rock, Gordon, who was still in the parking lot, told DeWald that he smokes marijuana and there was a small amount of marijuana

3

in Apartment 10A. (Tr. 53-55). DeWald had not asked Gordon any questions and was not speaking with Gordon when Gordon made this statement. (Tr. 53-54, 56). DeWald then asked Gordon to repeat what he had said to Det. Williams, and Gordon repeated his statement to Williams. (Tr. 10-11, 54-55). Officer DeWald then released Rock in front of Building 10 and the dog alerted to the presence of controlled substances at the front door of Apartment 10A. (Tr. 55).

Detective Williams and Officer DeWald then went to the back door of Apartment 10A where they both smelled a strong odor of marijuana. (Tr. 11-12, 36-37, 55-56). Sergeant Laughman stood at the front door. (Tr. 12, 84). As he stood there, Kayla Powell opened the door and began to leave the apartment. (Tr. 84). As she opened the door, Sgt. Laughman smelled burnt marijuana coming from the apartment. (Tr. 84-85). Det. Williams then left to apply for a search warrant for the apartment from a Fulton County magistrate judge. When the warrant was approved, the officers began searching the apartment. (Tr. 12-13). Det. Williams returned to Apartment 10A with the warrant at about 6:00 p.m. while the search was being conducted. (Tr. 12-13, 38, 83).

While Det. Williams was applying for the warrant, the other officers waited in

the apartment parking lot with Gordon. (Tr. 82). At some point during the wait, Gordon approached Sgt. Laughman and asked if he could ask him a question. (Tr. 69, 81, 83-84). Sgt. Laughman responded that he could. (Tr. 69). Gordon then said that he liked to tinker with firearms, such as putting grips and sights on them. (Tr. 69-70, 81). He wondered if he was prohibited from doing that because he is a convicted felon. (Tr. 69-70, 81). Sgt. Laughman told Gordon that it was illegal for a convicted felon to possess a firearm for any reason. Gordon then ended the conversation. (Tr. 70).

When Det. Williams returned from getting the warrant, he searched Gordon's bedroom, where he found a vacuum-sealed bag containing two ounces of marijuana. (Tr. 13, 41-42). Williams brought the bag out to the living room to show the other officers and Gordon what he had found. (Tr. 41). After he did so, Gordon said that Williams had found the marijuana that he (Gordon) had mentioned earlier. (Tr. 13-14, 42). Officers also found two safes in the kitchen. (Tr. 14). When Williams asked the other officers if they had found the keys to the safes, Gordon spoke up and said that he had the keys in his pocket, and there was nothing illegal in the safes. (Tr. 15, 42-43). Det. Williams did not expect Gordon to respond, as he was asking the question to his fellow officers. (Tr. 15, 43). The detective then took a key from Gordon's pocket and opened the safes. (Tr. 43-44).

5

During the search of the apartment, Gordon and Powell sat on a sofa in the living room while about five officers searched the apartment. (Tr. 39-40). About thirty minutes into the search, Det. Jeff Byrd found five pistols in the living room, and Gordon was handcuffed and formally arrested. (Tr. 14, 44-45, 87-88).

While conducting the search, Sgt. Laughman opened a kitchen cabinet and found a glass bowl that contained a white, paste-like substance. (Tr. 71). Laughman and another officer commented in Gordon's presence something to the effect of "that's how they make crack cocaine." (Tr. 41). Laughman asked Gordon what the substance was, and then remembering that Gordon had not been <u>Mirandized</u>, he told Gordon, "never mind, I don't want to know the answer, I'll find out what it is." (Tr. 71-72, 86). Sgt. Laughman then left the apartment and retrieved a drug test kit from his car. (Tr. 72). He was gone between five and eight minutes. (Tr. 87). When he returned to the apartment, Gordon said that the bowl contained caffeine paste, not cocaine. (Tr. 40-41, 72).

After the search, Sgt. Laughman summoned an officer to take Gordon and Powell to jail. (Tr. 73). While they were waiting to be transported, Gordon asked to speak to Sgt. Laughman. (Tr. 73, 88). Sgt. Laughman agreed to listen to what Gordon wanted to say. (Tr. 73). Gordon then asked if there was anything the sergeant could do to help

6

him out with the firearms charges. (Tr. 73, 88). Gordon told Laughman that the five firearms in his apartment belonged to someone else who he thought had already picked the guns back up; he did not realize the guns were still in the apartment. (Tr. 73-74). Laughman did not ask Gordon any questions during this exchange. (Tr. 74).

## II. DISCUSSION

Gordon moves to suppress the following statements:[1]

1. Statements to Officer DeWald that he smoked marijuana and had marijuana in his apartment (Doc. 43 at 26-27);

2. Statements to Sgt. Laughman about the white paste in the glass bowl (id. at 23-24); and

3. Statements to Sgt. Laughman about the firearms while Gordon was waiting for transportation to jail (id. at 27-28).

The well-known general rule is that a person who is arrested and detained must be given Miranda warnings in order for his statements (made in response to interrogation by a law enforcement officer) to be used against him in court. Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). Miranda requires, among other things,

---

[1] Defendant also moved to suppress the statements he made to Det. Williams during the search of the apartment about the bags of marijuana and the keys to the safes. (Doc. 43 at 24-26). However, the government has agreed not to use these statements in its case in chief (Doc. 44 at 15-16). Therefore, it is not necessary to discuss these statements.

7

that an arrestee be advised before questioning that he has the right to remain silent. Id. at 440, 86 S. Ct. at 1610.  At the time of the statements that he seeks to suppress, Gordon had not been given Miranda warnings, and the government concedes that he was in custody. (Doc. 44 at 10-11).  The government argues, however, that Miranda warnings were not required because Gordon's statements were not in response to interrogation.

Miranda protection covers only statements that are made in response to interrogation. See, e.g., Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991). However, the Supreme Court has made clear that interrogation includes more than just asking questions.  Interrogation includes the functional equivalent of express questioning, *i.e.*, "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689-90 (1980).  The Innis approach "focuses primarily upon the perceptions of the suspect," id. at 301, 100 S. Ct. at 1690, and requires inquiry into whether the words or actions of the authorities constitute coercive pressure "above and beyond that inherent in custody itself."  Id. at 300, 100 S. Ct. at 1689.

8

The Eleventh Circuit and other courts have declined to label police actions as interrogation even where the police directly confronted a suspect with incriminating evidence. See United States v. McKenzie, 132 F. App'x 788, 789-90 (11th Cir. 2005) (finding that police officer's conversation with defendant advising him that marijuana and cocaine were found in his room was not functional equivalent of interrogation); United States v. Hurst, 228 F.3d 751, 760 (6th Cir. 2000) (finding no Innis interrogation where suspect was told "we've got good information on you"); United States v. Payne, 954 F.2d 199, 201-02 (4th Cir. 1992) (finding that officer's statement, "They found a gun at your house," was not Innis interrogation).

The specific statements that Gordon seeks to suppress and his arguments are addressed below.[2]

### A. Statements to DeWald

Gordon argues that his statements to Officer DeWald were in response to the functional equivalent of express questioning because DeWald and Laughman discussed

---

[2] As the government points out, Gordon does not seek to suppress all of the statements he made to law enforcement officers on May 7, 2014, but only those identified in pages 23-28 of his post-hearing brief. (Doc. 44 at 17 n.3). However, under the applicable law discussed in this Report and Recommendation, even if Gordon had sought suppression of all of his statements, I would reach the conclusion that all of his statements were volunteered and not in response to the functional equivalent of interrogation.

in Gordon's presence their investigation and plans to allow the narcotics detection dog to conduct a sniff of Building 10. In evaluating this argument, it is instructive to consider in more detail the facts and holding of Innis. In Innis, after the suspect requested a lawyer, three officers placed him in a police car and drove him to the police station. On the way, two of the officers engaged in a conversation between themselves, in the presence of the suspect, concerning a missing shotgun, and commented that the missing gun posed a danger to handicapped children in the area. Their conversation prompted the suspect to show them where the gun was located. Innis, 446 U.S. at 294-95, 100 S. Ct. at 1686-87.

The Supreme Court held that the officers in Innis had not engaged in interrogation because there was no express questioning, and it could not be said that the officers should have known their conversation was reasonably likely to elicit an incriminating response from the suspect. Id. at 302, 100 S. Ct. at 1690. The Court conceded that the discussion placed "subtle compulsion" on the suspect, but ruled that "subtle compulsion" should not be equated with interrogation. Id. at 303, 100 S. Ct. at 1691.

Here, the conduct of the officers in discussing their investigation within hearing range of the defendant (including their plans to deploy the dog) was less likely to elicit

10

an incriminating response than the conversation of the officers in Innis. Therefore, Innis dictates the finding that the officers' discussion in the presence of the defendant was not the functional equivalent of interrogation.

### B. Statements to Laughman about white paste

Gordon argues that his statements to Sgt. Laughman about the white paste-like substance were in response to questioning because Laughman actually did ask about the substance. However, it is undisputed that immediately after asking the question, Laughman instructed Gordon not to answer the question, and then left the apartment for several minutes before returning to test the substance. It was reasonable for Sgt. Laughman to assume that Gordon would not talk further about the white substance because he immediately instructed Gordon that he did not want to know the answer, and that he would find out for himself. Under these circumstances, there was no reason for Laughman to believe that his question was reasonably likely to elicit an incriminating response from Gordon. Therefore, Gordon's statement to Laughman about the white paste should not be suppressed.

### D. Statements to Sgt. Laughman while Gordon was waiting for transportation to the jail

Finally, Gordon argues that the statements he made to Sgt. Laughman after he had been formally arrested and was waiting for transportation to the jail should be

11

suppressed. Gordon asked Laughman if he could do anything about the firearms charges. Gordon said that the five firearms in his apartment belonged to someone else who he thought had already picked them up; he did not realize the guns were still in the apartment. (Tr. 73-74, 88). Laughman did not ask Gordon any questions to elicit these statements. He only agreed to listen to what Gordon wanted to say. (Tr. 74). Gordon argues that these statements were made in a coercive environment. (Doc. 43 at 27). However, there is some degree of coercion in any arrest. There is no basis to conclude that there was coercive pressure on Gordon above and beyond that inherent in the arrest and custody itself.

## III.   CONCLUSION

For the reasons discussed above, I **RECOMMEND** that Defendant's Motion to Suppress Statements (Doc. 14) be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

**IT IS SO RECOMMENDED**, this 9th day of June, 2015.

_____
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE